**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION**


**BEN SMITH**                                                                          **PLAINTIFF**


**v.**                                        **NO. 2:22-cv-00139-PSH**


**KILOLO KIJAKAZI, Acting Commissioner**                      **DEFENDANT**
**of the Social Security Administration**


## MEMORANDUM OPINION AND ORDER

Plaintiff Ben Smith ("Smith") challenges the denial of his applications for disability insurance benefits and supplemental security income payments. It is Smith's contention that his residual functional capacity was erroneously assessed because the medical opinions of his treating psychiatrist were improperly discounted, and the Administrative Law Judge ("ALJ") failed to consider Smith's work record. Because substantial evidence on the record as a whole supports the ALJ's decision, and he committed no legal error, his decision is affirmed.[1]

---

[1]     The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole and not based on legal error. See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019).

Smith maintains that he became disabled on January 6, 2014, as a result of impairments that include a schizoaffective disorder, depressive type, severe, with psychotic symptoms. Because he has now been awarded benefits based on an onset date of May 1, 2018, the relevant period in the case at bar is from January 6, 2014, through April 30, 2018.[2]

The record reflects that in November of 2015, Smith presented to Mid-South Health Systems ("Mid-South"), a mental health facility, for an intake assessment. See Transcript at 422-427. He reported being depressed, noting that his depression began in January of the previous year when he lost his job as a result of his excessive tardiness. He also reported thoughts of overdosing. Smith reported that his depression manifests itself in ways that include the following: he has difficulty sleeping, he forgets things, and he struggles with concentration. A mental status examination revealed, in part, that although he had a logical thought process and a full affect, he had impairments to his thought content. A summary of the examination provided the following:

---

[2]     The Acting Commissioner of the Social Security Administration represents, and Smith does not dispute, that on April 25, 2018, while the current applications at bar were pending, Smith filed new applications for disability insurance benefits and supplemental security income payments. The second round of applications were approved "with an established onset date of disability of May 1, 2018." See Docket Entry 16 at CM/ECF 2. The ALJ properly noted that the relevant period for the applications at bar is from January 6, 2014, through April 30, 2018. See Transcript at 475.

> Client presents casually dressed and gave good eye contact. Client has a positive mood and is cooperative. Client states he hears voices and sees things "all the time, they call my name, be trying to tell me something, just [carrying] on a conversation and I see people like my brother and my mother and peoples I know who passed away."

See Transcript at 423. A master treatment plan reflects that Smith was diagnosed with a major depressive disorder, single episode, with psychotic feature. It was recommended that he see a psychiatrist.

Smith returned to Mid-South in December of 2015 and saw Dr. Gerald Stein, M.D., ("Stein") for a psychiatric evaluation. See Transcript at 429-431. Smith's psychiatric history was recorded, and although he had no prior psychiatric hospitalizations, treatment, or therapy, he did have a suicide attempt. A mental status examination revealed the following:

> General appearance: He is casually dressed, cooperative, makes good eye contact. There is no psychomotor agitation or retardation.

> Speech: The rate, rhythm, tone, and volume of his speech are normal.

> Orientation: He does not know what the date is, but he knows it is toward the end of the month and knows the day of the week and the place where he is.

> Thought processes: Logical, linear, and goal directed but not concrete, circumferential, tangential, nor do they show loosened associations.

Psychotic Thought Content: He has auditory hallucinations which command him to hurt himself, visual and tactile hallucinations and delusions. He believes that dead people come back to life as animals. He denies having olfactory hallucinations.

He is not suicidal or homicidal now but has been suicidal in the past.

Concentration: Five number forward without error and three numbers backwards. His long-term memory is good. Short-term memory, when given three items to remember he could only remember two initially. After 5 minutes he could only remember any two.

Mood/affect: Euthymic.

Judgment: Good.

Insight: Fair.

Ability to abstract proverbs: Good.

Intelligence: Average.

See Transcript at 430. Stein re-affirmed the earlier diagnosis of a major depressive disorder, single episode, with psychotic feature. He secondarily diagnosed a bipolar disorder and a panic disorder with agoraphobia. He prescribed Risperdal for hallucinations, Celexa for depression, Lithium for bipolar, and Trazodone for sleep. Smith was directed to return in three months.

Smith returned to Mid-South in March of 2016 and saw Dr. Sarita Subba, M.D., ("Subba") for what the progress note reflects was medication maintenance. See Transcript at 439-441. Smith reported that his depression actually began in 2009 when his brother died and worsened in January of 2014 when Smith lost his job. Smith reported that his medication was helping, but it caused muscle spasms. He reported experiencing visual and auditory hallucinations and believed that someone was watching him. He also reported a suicide attempt a few months earlier and possible hypomanic episodes. A mental status examination was otherwise unremarkable. Subba adjusted Smith's medication and started him on Cogentin for muscle spasms. He was directed to return in three weeks.

Smith returned to Mid-South in April of 2016 and saw Subba for what the progress note reflects was medication maintenance. See Transcript at 436-438. Smith reported that he was feeling much better. He was no longer depressed or having suicidal ideations. He was sleeping better and denied hypomanic or psychotic symptoms, but he was still having visual hallucinations. He noted that his medication was causing muscle spasms and tremors. A mental status examination was unremarkable. Smith's dosage of Lithium was reduced, but he was otherwise continued on his medication. He was directed to return in two months.

Smith returned to Mid-South in August of 2016 and saw Subba for what the progress note reflects was medication maintenance. See Transcript at 457-461. Smith reported that his medication was no longer effective, but he admitted that he was not taking it as prescribed. He was experiencing visual and auditory hallucinations and "paranoid persecutory delusions." See Transcript at 457. A mental status examination, though, was largely unremarkable. Subba revised Smith's diagnosis to a schizoaffective disorder, depressive type, and adjusted his medication. He was directed to return in two months.[3]

In February of 2017, Subba completed a Medical Source Statement-Mental on behalf of Smith. See Transcript at 463-464. Subba represented in the Statement that Smith suffers from a schizoaffective disorder, depressive type, severe, with psychotic symptoms. The impairment causes "marked" and "moderate" limitations in most areas of understanding and memory, sustaining concentration and persistence, social interaction, and adaptation. Subba opined that Smith's impairment, or treatment for his impairment, would cause him to miss work more than three days per month.

---

[3]    An annual review of the Mid-South master treatment plan was conducted in December of 2016. See Transcript at 452-456. Smith was not present during the completion of the review process.

The record contains a summary of Smith's work history. <u>See</u> Transcript at 655-670. The summary reflects that he has a good work history, having worked steadily through 2013 and some in 2017 and 2018.

Smith testified during the first administrative hearing held in April of 2017. <u>See</u> Transcript at 34-49. He was sixty years old at the time of the hearing and living by himself. He last worked full-time in 2014 but had worked temporarily in 2017 and 2018. He was asked about his mental impairments, and he testified as follows:

> Q. And, now, you also go get treatment at Mid-South Health Systems. Why do you go there?
>
> A. Well, I was seeing things and hearing things, and I was depressed and feeling—feeling suicidal.
>
> Q. Now, you've seen a couple of different doctors there, and currently you're seeing a Dr. Suba (phonetic)?
>
> A. Yes.
>
> Q. Now—and has the treatment helped you in any way?
>
> A. It was helping me for a while there, but things started getting back to the way it was. I still see and hearing things.
>
> Q. If you try to go back to one of your old jobs, do you think you could keep your mind on your work and do the things you're supposed to do and, you know, do your work, you know, like you're supposed to and remember what you're supposed to do?

A.  To  be  honest,  no,  I  don't  think  I'd  be  able  to
concentrate  like  I  used  to.  I  get  confused  on  things.  You  know,
I  lose  track  of  things,  what  I'm  supposed  to  do.

Q.  Is  there  anything  that—what  distracts  you?  What  seems
to  cause  you  to  lose  track  of  things?

A.  It  seems  like  I'll  be  concentrating  on  one  thing  and
just—like,  somebody  could  come  tell  me  to  do  something,  and
somebody  else  will  come  up  and  ask  me  to  do  something.  It
seems  like  I  get  confused  about  what  I'm  supposed  to  do  if
somebody  else  come  and  ask  me  to  do  something.

See Transcript at 42-43.

The ALJ issued a decision denying Smith's applications, see Transcript

at 15-25, and Smith appealed. The case was eventually remanded for

additional administrative review.[4]

Smith testified during the second administrative hearing held in

February of 2020. See Transcript at 500-508. During the relevant period,

he stopped mental health treatment at Mid-South. He also stopped taking

medication for his impairment because the medication was unhelpful and

causing drowsiness.

---

[4]      In November of 2018, or following the remand, Smith was seen by Dr. Kenneth
B. Jones, Ph.D., ("Jones") for a mental diagnostic evaluation at the request of the
agency. See Transcript at 785-789. Smith reported that he was working between twenty
and thirty hours a week as a janitor at a residential care facility and had been doing so
for one year. Because Jones performed the evaluation seven months after the relevant
period, it is unclear how much consideration to give the evaluation. The ALJ appears
to have given the evaluation little consideration, although it is worth noting that Smith
acknowledged having been working for one year, or well within the relevant period.

The ALJ found at step two of the sequential evaluation process that Smith's severe impairments include an affective mood disorder. The ALJ assessed Smith's residual functional capacity and found that Smith is capable of performing medium work with some additional mental and physical limitations. As a part of so finding, the ALJ discounted Subba's medical opinions for the following reasons:

> ... Dr. [Subba's] treatment mental health notes are for medication management only, and he never felt it necessary for the claimant to be hospitalized. He was not placed in an intensive outpatient program nor was he admitted to partial hospitalization. He never needed emergency intervention for psychotic symptoms or a psychotic break, and the record fails to show that the claimant received mental health counseling for his mental conditions. Simply put, Dr. [Subba's] marked limitations are inconsistent with her treatment records and treatment advice. Furthermore, the claimant reported that his mental health condition improved with medication, when he was compliant, but he reported on more than one occasion that he did not take his medication as prescribed. Dr. [Subba] never documented that the claimant's noncompliance was a symptom of his mental illness. Although Dr. [Subba's] opinion would support the residual functional capacity in social and concentration, persisting and maintaining pace, it does not support the claimant's overall ability to function in all areas. Furthermore, the [ALJ] notes that the claimant's mental condition has not progressed to the extent that the claimant required injections due to symptoms of his disease. For these reasons, the [ALJ] finds that the claimant's improved mental health condition would not prevent all work activity.

See Transcript at 483. The ALJ noted his obligation to consider Smith's work history, doing so at several junctures in the written decision, but the ALJ did not otherwise mention Smith's work history in the decision. The ALJ found at step four that Smith cannot perform his past relevant work but found at step five that there is other work he could perform. Given those findings, the ALJ concluded that Smith is not disabled within the meaning of the Social Security Act.

Smith maintains that his residual functional capacity was erroneously assessed and offers two reasons why. Smith first maintains that the ALJ improperly discounted Subba's medical opinions as the reasons the ALJ gave for doing so are not supported by substantial evidence on the record as a whole. Smith maintains that there is no requirement that a person be hospitalized, institutionalized, or need emergency care before "the effects of [a] mental impairment[] can be considered serious." See Docket Entry 10 at CM/ECF 28. Smith additionally maintains that Subba's opinions are consistent with her own treatment notes as she repeatedly found that Smith suffered serious symptoms during the relevant period; his non-compliance with medication may be a symptom of his mental impairment; and the ALJ failed to specify "what injections a person with severe mental illness like Smith's might need," see Docket Entry 10 at CM/ECF 33.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most the claimant can do despite his limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The ALJ must consider all of the relevant evidence in making the assessment. See Grindley v. Kijakazi, 9 F.4th 622 (8th Cir. 2021).

In assessing the claimant's residual functional capacity, the ALJ must weigh the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). A treating physician's opinions are entitled to controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence. See Michel v. Colvin, 640 Fed. Appx. 585 (8th Cir. 2016).[5] The opinions may be discounted if, for example, they are inconsistent with the physician's own treatment notes. See Martise v. Astrue, 641 F.3d 909 (8th Cir. 2011). Whether a treating physician's opinions are given substantial weight or little weight, the ALJ must always give "good reasons" for the weight given the opinions. See Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

---

[5]     Smith represents, and the Court agrees, that the Social Security Administration adopted new regulations regarding the evaluation of a treating physician's medical opinions, and the new regulations apply to claims filed after March 27, 2017. See Docket Entry 10 at CM/ECF 27, n.1. Here, Smith's claim was filed before March 27, 2017. His claim is therefore governed by the prior regulations.

The ALJ discounted Subba's medical opinions for a number of reasons. Although one of the reasons is suspect, i.e., "the claimant's mental condition has not progressed to the extent that the claimant required injections due to symptoms of his disease," see Transcript at 483, two of the reasons are good reasons and are supported by substantial evidence on the record as a whole.

Smith undoubtedly suffers from a mental impairment that has been characterized at times as a schizoaffective disorder, depressive type, severe, with psychotic symptoms; a major depressive disorder, single episode, with psychotic feature; a schizoaffective disorder, depressive type; and an affective mood disorder. The question for the ALJ is the extent to which the impairment caused Smith work-related limitations during the relevant period. Subba opined that the impairment caused several "marked" and "moderate" limitations in most areas of understanding and memory, sustaining concentration and persistence, social interaction, and adaptation. She additionally opined that the impairment, or treatment for the impairment, would cause Smith to miss work more than three days per month. The ALJ could and did find, though, that Subba's own treatment notes do not support such severe limitations.

Smith appears to have seen Subba on three occasions: March of 2016, April of 2016, and August of 2016. At the first presentation, Smith was depressed and reported, inter alia, visual hallucinations, auditory hallucinations, and that he believed someone was watching him. He also reported a recent suicide attempt and possible hypomanic episodes. When Smith saw Subba a second time, Smith was feeling much better, was no longer depressed, and was having no suicidal ideations. A mental status examination was unremarkable. Smith's condition had worsened by the time of the third presentation, but Subba noted that Smith was not taking his medication as prescribed. A mental status examination was again unremarkable. Given Subba's inconsistent findings and observations, and largely unremarkable mental status examinations, the ALJ could and did find that Subba's opinions are inconsistent with her own treatment notes.

The ALJ could and did also find that Subba's medical opinions are inconsistent with the record as a whole. First, although Smith alleged disability beginning in January of 2014 as a result of, inter alia, a mental impairment, he did not seek any form of treatment for his mental impairment until November of 2015, or approximately twenty-two months after the alleged onset date. When he did seek treatment, he did so only sporadically and appears to have sought no treatment after August of 2016.

Second, Smith was never hospitalized, never required emergency care, and never received therapy of any kind for his mental impairment. The only treatment he received was in the form of medication. Although the Court agrees that a person need not be hospitalized, require emergency care, or receive therapy before "the effects of [a] mental impairment[] can be considered serious," see Docket Entry 10 at CM/ECF 28, the ALJ could and did consider the absence of such care.

Third, Smith's condition appears to have improved with medication, when he took it as prescribed. It is true that at the third presentation with Subba, Smith reported that the medication was not helping. The ALJ could and did find, though, that the medication may not have been helping because, as Subba noted, Smith was not taking it as prescribed.

Fourth, it is undisputed that Smith was non-compliant with his medication, and there is no evidence that his non-compliance was a symptom of his mental illness. In fact, the Mid-South master treatment plan reflects that there were "[n]o barriers" to treatment. See Transcript at 425. Although it is true that a claimant's non-compliance with his medication can be the result of his mental impairment, the ALJ could and did note that there was nothing to suggest Smith's mental impairment caused his non-compliance.

It is not the role of the Court to re-weigh the evidence and, even if the Court would decide the case differently, it cannot reverse the ALJ's decision if the decision is supported by good reasons and is based on substantial evidence on the record as a whole. See Dillon v. Colvin, 210 F.Supp.3d 1198 (D.S.D. 2016). Here, the ALJ could find as he did with respect to Subba's medical opinions.

Smith offers a second reason why his residual functional capacity was erroneously assessed. He maintains that his work history was not given adequate consideration.

Substantial evidence on the record as a whole supports the ALJ's consideration of Smith's work history. Smith testified at both administrative hearings about his work history, see Transcript at 37-40, 47-49, 503-504, work that includes being a machine operator, warehouse worker, dishwasher, and waiter. The ALJ noted Smith's work history at several junctures in the written decision, and the Court presumes that the ALJ considered Smith's work history at each juncture. In any event, a claimant's work history is but one factor the ALJ should considered in crafting a claimant's residual functional capacity. It is not clear how a more extensive analysis of Smith's work history would have led to a different assessment of his residual functional capacity.

15

The governing standard in this case, i.e., substantial evidence on the record as a whole, allows for the possibility of drawing two inconsistent conclusions. See Culbertson v. Shalala, 30 F.3d 934 (8th Cir. 1994). The ALJ crafted an assessment of Smith's residual functional capacity that limited him to medium work with some additional mental and physical limitations, and substantial evidence on the record as a whole supports the assessment.[6]

The Court therefore finds that there is substantial evidence on the record as a whole to support the ALJ's findings, and he did not commit legal error. Smith's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 4th day of May, 2023.

_____
UNITED STATES MAGISTRATE JUDGE

---

[6]    Smith additionally maintains that the evaluation of his daily activities was "almost non-existent." See Docket Entry 10 at CM/ECF 35. The Court disagrees for the reasons set forth by the Acting Commissioner of the Social Security Administration. See Docket Entry 16 at CM/ECF 6-12.